AO 91 (Rev. 11/11) Criminal Complaint

**FILED**

7/31/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Alejandro G. Ortega (312) 353-4129

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

XIAO MEI

CASE NUMBER: 25 CR 449

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about February 15, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1956(a)(1)(B)(ii) and 1960 | Money laundering and unlawful operation of an unlicensed money transmitting business |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

*Robert J. Kelly, Jr.*

ROBERT J. KELLY, JR.
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 31, 2025

*Maria Valdez*

*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, ROBERT J. KELLY, JR., being duly sworn, state as follows:

1.      I am a Special Agent with the Homeland Security Investigations ("HSI") and have been so employed for 15 years. My current responsibilities include the investigation of money laundering and the operation of unlicensed money transmitting businesses.

2.      This affidavit is submitted in support of a criminal complaint alleging that Xiao Mei has violated Title 18, United States Code, Sections 1956(a)(1)(B)(ii) and 1960. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MEI with money laundering and unlawfully operating an unlicensed money transmitting business, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offenses alleged in the complaint.

3.      This affidavit is based on my training and experience, my personal knowledge, review of recorded conversations, law enforcement reports, and information that I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

## BACKGROUND ON MONEY LAUNDERING

4.     I am aware there are numerous money laundering and drug trafficking organizations ("MLDTOs") operating in the country of Mexico. Examples of some of these MLDTOs include the Sinaloa Cartel, La Familia Cartel, Knights Templar Cartel, Juarez Cartel, and the Gulf Cartel. In general, these Mexico-based MLDTOs purchase South American processed cocaine, which is transshipped through Mexico and smuggled into the United States. These MLDTOs also grow, cultivate, cook, and process heroin, methamphetamine, and marijuana in Mexico and subsequently smuggle the controlled substances into the United States for resale. The sale of these controlled substances in the United States generates substantial cash proceeds for the MLDTOs, which cash represents the cost of goods sold and illegal profits.

5.     I am also aware that after the sale of the controlled substances, the proceeds from the sales must be collected, counted, packaged, and delivered in some fashion to the MLDTOs. These funds may represent the cost of goods sold and illegal profits. At times, both the cost of goods sold, and profits, are laundered directly into Mexico. This can occur through a technique known as bulk cash smuggling. Bulk cash smuggling consists of concealing and exporting large sums of United States currency ("USC") without declaring the funds at the United States border. Transportation of bulk USC may be accomplished via semi-trailers, automobiles, airplanes, trains, and commercial bus lines. One disadvantage of bulk cash smuggling

is the risk of transporting large sums of cash through the United States and onward to Mexico. Specifically, the loads of USC are susceptible to theft or interdiction by law enforcement. An additional disadvantage to bulk cash smuggling is the resulting accumulation of large quantities of USC in Mexico by the MLDTOs, which has become increasingly difficult for MLDTOs to integrate into the Mexican financial system.

6.     To circumvent the risks of bulk cash smuggling, MLDTOs frequently utilize U.S.-based banks and businesses to launder narcotics proceeds. The USC is either directly wire transferred to Mexican-based bank accounts after being deposited into U.S. bank accounts, or the funds are integrated into the United States financial system through a more elaborate money laundering scheme known as "trade-based money laundering."  These services are provided to the MLDTOs by brokers, typically based in Mexico, who have the contacts needed to accept large sums of USC and cause those funds to be deposited into a U.S.-based bank account.

7.     One of the most common practices for an MLDTO-associated broker to collect USC in the United States is through a "money pickup." In a typical money pickup, the MLDTO-associated broker arranges for a U.S.-based co-conspirator (the "money laundering ('ML') courier") to meet an individual in possession of a large quantity of cash narcotics proceeds (the "drug trafficking ('DT') courier"). As discussed further below, to arrange the meeting, the ML courier typically provides the MLDTO-associated broker a

telephone number, a code phrase or name, and the serial number of a dollar bill in the ML courier's possession. This serial number is used as an identifier for the specific money laundering transaction at issue (MLDTO-associated brokers often simultaneously handle multiple money laundering contracts), and later functions as a receipt issued by the ML courier to the DT courier to prove that the money pickup was completed. The MLDTO-associated broker then passes this information to the MLDTO drug trafficker client, who in turn passes it to the affiliated U.S.-based DT courier. The DT courier then uses the phone number to contact the ML courier and arrange a physical meeting in the United States at which the DT courier transfers the narcotics proceeds to the ML courier. During this initial contact, the DT courier will address the ML courier by his/her code name, and/or use a code phrase to confirm the DT courier's identity and provide the serial number to identify the specific transaction.

8. After the DT and ML couriers make contact, they typically agree upon a public place to meet and conduct the exchange of the cash narcotics proceeds. Utilizing a public place, such as a hotel lobby or a parking lot, allows the parties to maintain a degree of anonymity, which reduces the risk of theft and cooperation with law enforcement if one party is subsequently arrested. After a location is agreed upon, the DT courier meets with the ML courier and delivers the bulk USC. Typically, the ML courier then passes the dollar bill with the previously provided serial number to the DT courier as a "receipt"

4

for the money transfer. The USC is frequently transported in large bags and suitcases to conceal the contents.

9.     Upon completion of the money pickup, the MLDTO-associated broker typically assumes responsibility for the cash to the MLDTO if it is lost, stolen, or seized prior to delivery to the MLDTO. As such, the MLDTO-associated money broker will generally seek to have the cash deposited into a U.S. bank account as soon as possible. Generally, bulk cash narcotics proceeds are deposited into the banking system in one of two ways, both of which are designed to conceal the illicit source of the funds. The first is through structured deposits, meaning that a bulk cash sum is broken down into several deposits of under $10,000 each to avoid bank reporting requirements. The second is through "trade-based money laundering," in which narcotics proceeds are used to purchase legitimate goods or services and enter the banking system concealed as the proceeds of lawful business. On occasion, the MLDTO-associated money broker will require the ML courier to provide copies of deposit tickets or wire instructions as proof of the deposit or wire transfer of the funds. At times, this information is provided to the MLDTO to confirm that the illegal proceeds were received, deposited, or wire transferred. Ultimately, after entering the banking system, the funds are remitted to accounts in Mexico controlled by MLDTO-associated brokers, who withdraw the funds and deliver them to their drug trafficker clients in Mexico. The

MLDTO typically pays the MLDTO-associated brokers and his/her couriers through a percentage fee of the total amount laundered per transaction.

10.     I am also aware the MLDTOs utilize Chinese money laundering organizations ("CMLO") to facilitate the previously described techniques.

11.     The CMLOs and MLDTOs also use so-called "mirror transactions" to launder money across international borders for DTOs. In a mirror transaction, a DTO delivers cash to a courier for a money laundering organization. That courier in turn gives the money to a business in need of cash. That business then transfers an equivalent amount of another currency to a foreign bank account belonging to a member of the money laundering organization. The account owner(s) then withdraws the money in cash and hands it back over to the drug trafficking organization. No paper trail connects the final cash in the hands of the drug trafficking organization with the cash it originally obtained in exchange for drugs.

12.     CMLOs utilize various couriers who are expected to conduct one to two transactions per week, each ranging from $50,000 to $1 million. The couriers typically receive USC from a DTO and give that cash to an American business or individual that has access to Chinese renminbi.[1] The American business or individual then deposits an equivalent amount of Chinese renminbi into a Chinese bank account provided by the courier. The CMLOs then

---

[1] Renminbi is the official currency of the People's Republic of China.

withdraws the renminbi as "clean" United States or Mexican currency to give back to the DTO.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### *Summary*

13.     Since approximately February 2024, federal law enforcement, including HSI, has been conducting a criminal investigation of a CMLO, including MEI and other individuals, for money laundering and the unlawful operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1960 (the "**Subject Offenses**"). Through its investigation, HSI has learned that MEI is a Chicago-based money broker who coordinates money laundering in the Chicago area. Law enforcement originally identified MEI through a cooperating source ("CS-1").[2] Specifically, CS-1 explained to law enforcement that MEI contacts CS-1 on an almost daily basis using WeChat[3] to conduct money

---

[2] CS-1 has been cooperating with law enforcement since approximately January 2024. CS-1 is cooperating with law enforcement for financial compensation. CS-1 has provided information during this investigation which I believe has been useful and reliable. Some of the information provided by CS-1 has been corroborated by independently obtained evidence, including information verified through a review of law enforcement databases. CS-1 does not have any criminal history.

[3] Based on my training and experience, and publicly available information, WeChat is a multiplatform messaging service widely used in China and owned by Tencent Holdings. The application enables users to chat directly or in groups using text, voice, and video. Users can communicate through text messages and voice and video calls. Users can also send recipients voice messages, which are audio notes similar to voicemails. Users can also share documents, such as photos, videos, PDFs, and documents. WeChat can be used on smartphones, such as iPhones and Android devices, tablets, such as iPads, and desktop and laptop computers, including Macs and PCs.

pickups of suspected narcotics proceeds and then launder the proceeds for MEI.

14.     As further described below, CS-1 has been communicating with MEI since approximately February 2024. According to CS-1, MEI contacts CS-1 when MEI has suspected narcotics proceeds and needs to launder the money to China or via cryptocurrency. CS-1 in turn coordinates with an associate, Individual A, who accepts bulk USC and then transfers the equivalent amount to China for a fee via a mirror transaction (described above). From time to time, MEI also asks CS-1 to facilitate the laundering of bulk cash through cryptocurrency, and CS-1 informs MEI when CS-1 has an associate who can do so.

### *February 15, 2024, Bulk Cash Pickup and Delivery to Individual A*

15.     On or about February 15, 2024, CS-1 contacted law enforcement and advised that MEI asked CS-1 if CS-1 could drive with MEI to pick up approximately $40,000 from a "foreigner," because MEI does not like to go alone when she conducts bulk cash transfers with "foreigners." Based on my training, experience, and my knowledge of the investigation, I believe that the term "foreigner" in this context refers to a non-Chinese individual.

16.     At law enforcement's direction, on February 15, 2024, at approximately 4:40 p.m., CS-1 picked MEI up in CS-1's vehicle (the "CSV") and, at MEI's direction, CS-1 and MEI drove to a meet location in the Chicago area. According to CS-1 and video recordings,[4] at approximately 4:55 p.m., a compact white two-door vehicle

---

[4] The CSV was equipped with video recording devices.

bearing Illinois license plate EE 41474, being driven by Individual B with Individual C in the passenger seat, arrived and pulled up next to the CSV. MEI gave Individual C a dollar bill. Based on my training, experience, and knowledge of the investigation, I believe that the dollar bill was being used as a code so that both parties knew they were meeting with the correct person and could safely transfer the bulk cash. A few seconds later, Individual C gave MEI a black bag that contained bulk cash. Individual B and Individual C in the white two-door vehicle then drove away from the area.

17.     After the transaction, CS-1 told MEI that CS-1 would pick MEI up again in a few hours and drive MEI to meet with Individual A and transfer the bulk cash to Individual A, so that Individual A in turn could launder the money into China using a mirror transaction. CS-1 then dropped MEI off in the Chinatown area of Chicago where MEI exited the CSV with the black bag that contained the bulk cash. CS-1 then drove away from the area.

18.     According to CS-1 and audio and video recordings, at approximately 10:00 p.m., CS-1 told MEI via WeChat that CS-1 would pick MEI up at approximately 10:30 p.m. At approximately 10:30 p.m., CS-1 used the CSV and picked up MEI near the Chinatown neighborhood in Chicago. MEI was carrying the same black bag that she had received earlier in the day. CS-1 and MEI drove to the area of Individual A's residence located near the intersection of East Erie Street and North Wabash Avenue, in Chicago (the "Individual A Residence") and Individual A entered the CSV. Inside the CSV, MEI gave the bulk cash to Individual A. According to CS-1 and based on my knowledge of the investigation, I know that thereafter, Individual A planned to

9

transfer the equivalent amount of cash, minus fees, to a Chinese bank account with account information provided by MEI. Individual A then exited the CSV and CS-1 drove MEI back to the Chinatown area.

### *March 5, 2024, Delivery of Approximately $50,000 to Individual A*

19.     According to CS-1, on or about March 4, 2024, MEI contacted CS-1 via WeChat and told CS-1 that MEI had picked up approximately $50,000 from the "foreigners" and asked CS-1 if Individual A could launder the money to China. CS-1 confirmed. That same day, at approximately 8:30 p.m. MEI sent CS-1 information via WeChat for a Chinese bank account, and CS-1 forwarded the information to Individual A.

20.     According to CS-1 and audio and video recordings, on or about March 5, 2024, CS-1 coordinated with MEI via WeChat to pick MEI up at her residence located near the intersection of West 43rd Street and South Halsted Street, in Chicago (the "MEI Residence") in the CSV. When she was picked up by CS-1, MEI possessed a bag that contained bulk cash. CS-1 then drove to the Individual A Residence. Individual A exited the Individual A Residence and entered the CSV. Inside the CSV, MEI gave the bag containing bulk USC to Individual A. According to CS-1 and based on my knowledge of the investigation, I know that thereafter, Individual A planned to transfer the equivalent amount of cash, minus fees, to the Chinese bank account. Individual A then exited the CSV and CS-1 drove MEI back to the MEI Residence.

### *April 5, 2024, Bulk Cash Pickup*

21.     According to CS-1, on or around April 2, 2024, MEI began coordinating with CS-1 via WeChat to pick up approximately $100,000 from "foreigners" to launder the money. Specifically, MEI asked CS-1 if CS-1 could pick up the bulk cash and then transfer the equivalent minus fees in cryptocurrency, specifically USDT (Tether). CS-1 told MEI that CS-1 had a "friend" who could do this type of transaction for a 3% fee. MEI agreed to conduct the transaction. MEI further explained to CS-1 that MEI wanted to structure the transaction such that CS-1 would give $70,000 of the cash to CS-1's cryptocurrency-laundering contact to launder using cryptocurrency, then give the other $30,000 to a different contact who would launder the $30,000 into China using a mirror transaction. CS-1 agreed. MEI then sent CS-1 a code, via WeChat, for a cryptocurrency wallet to use to launder the $70,000.

22.     A few days later, on or about April 5, 2024, at approximately 9:35 a.m., CS-1, using the CSV, picked up MEI at the MEI Residence and drove MEI to a meet location on approximately the 2900 block of S. Elias Court, in Chicago, near Chinatown. According to CS-1, video recordings, and physical surveillance, at approximately 9:42 a.m., Individual D and Individual E exited a residence near the meeting location. Individual D was holding a white plastic trash bag, which Individual E handed to CS-1 through the driver's side window of the CSV. CS-1 then drove away. The plastic bag contained approximately $100,000. MEI took possession of the $100,000, separated it out into $70,000 and $30,000 portions, and then left the $30,000 in the white plastic bag.

11

23.     CS-1, with MEI still in the CSV, then drove to the approximate location of South Princeton Street and South Tan Court, in Chicago, near Chinatown Square, to meet with Individual F, who was an associate of CS-1 and who launders money to China using mirror transactions. After arriving at the meet location, CS-1 exited the CSV and walked up to Individual F, who was waiting in a black Tesla. CS-1 then handed the white plastic bag that contained $30,000 to Individual F. CS-1 then departed the area with MEI, dropped MEI off at the MEI Residence and kept possession of the $70,000.

24.     CS-1 then reunited with law enforcement and gave them possession of the approximately $70,000 in bulk cash.[5] Law enforcement performed a K9 sniff of the currency, which alerted positive for the presence of narcotic residue. Law enforcement deposited the bulk cash into a bank and, utilizing an undercover HSI cryptocurrency wallet, sent $70,000 worth of USDT (Tether) to the cryptocurrency wallet that MEI had provided to CS-1.

### *May 1, 2024, Bulk Cash Pickup*

25.     According to CS-1 and audio recordings, on or around April 29, 2024, MEI communicated with CS-1 via WeChat and asked CS-1 if CS-1 would again accept $50,000 in bulk cash and exchange it for USDT (Tether) for a 3% fee. CS-1 confirmed. MEI again sent CS-1 information via WeChat for a cryptocurrency wallet where CS-1 was to send the $50,000.

---

[5] The exact amount of money that law enforcement took possession of was $72,200.

26.     The next day, on or about April 30, 2024, MEI contacted CS-1 via WeChat and told CS-1 to pick up the $50,000 the following day, May 1, 2024. MEI also instructed CS-1 to send an additional $5,000 to a separate cryptocurrency wallet, and MEI, via WeChat, provided CS-1 with information for this wallet.

27.     On or about May 1, 2024, MEI contacted CS-1 via WeChat and told CS-1 that MEI would meet CS-1 at a location near Chinatown at approximately 12:00 p.m. to deliver the bulk cash. MEI further related that she only had $35,000 and that she would not have the extra $20,000 until later that evening. Prior to the transaction, law enforcement established physical surveillance at the MEI Residence. According to surveillance, at approximately 11:55 a.m., MEI's garage door opened, and MEI exited driving a white Porsche.[6] An unknown older female entered the passenger seat, and the Porsche drove away.

28.     According to physical surveillance, MEI drove from the MEI Residence straight to the location where MEI was to meet with CS-1. At approximately 12:05 p.m., MEI arrived at the meet location and met with CS-1 in the parking lot located at approximately the intersection of South Jefferson Street and West Cermak Road, in Chicago. Upon arriving, MEI exited the Porsche, opened the rear driver's side door, and retrieved a small gift bag. MEI then walked over to the front passenger side door of the CSV and gave a white plastic bag to CS-1 through the front passenger window. MEI then returned to the Porsche and departed the area.

---

[6] On or about June 21, 2024, Magistrate Judge Jeffrey Cole authorized the placement of a tracking device on the white Porsche. *See* 24 M 504.

29.     CS-1 reunited with law enforcement at a pre-determined location and handed over the white plastic bag, which contained $36,050 in bulk cash. Law enforcement performed a K9 sniff of the currency, which alerted positive for narcotic odor. During an ensuing debriefing, CS-1 told law enforcement that as CS-1 drove away from the meet location, MEI called CS-1 via WeChat and told CS-1 that MEI was being followed by law enforcement and correctly identified the law enforcement vehicle. MEI also told CS-1 to be careful.[7] Law enforcement then deposited the bulk cash into a bank and used an HSI undercover cryptocurrency wallet to send $35,000 worth of USDT to the two cryptocurrency wallets that MEI had specified to CS-1.

### May 8, 2024, Bulk Cash Pickup

30.     According to CS-1 and audio recordings, MEI contacted CS-1 via WeChat on or around May 6, 2024, and asked whether CS-1 could accept $50,000 in bulk cash and exchange it for cryptocurrency. CS-1 confirmed.

31.     The next day, on or about May 7, 2024, MEI contacted CS-1 via WeChat and instructed CS-1 to pick up the $50,000 the following day, May 8, 2024. MEI then provided CS-1 with information for two cryptocurrency wallets where CS-1 was to send the bulk cash.

32.     According to CS-1, physical surveillance, and audio recordings, the next day, on or about May 8, 2024, at approximately 9:40 a.m., CS-1 drove to the meet location at approximately South Jefferson Street and West Cermak Road, in the Chinatown section of Chicago, driving the CSV. According to physical surveillance,

---

[7] CS-1's relation of these facts is corroborated by audio recordings of the conversation.

at approximately 9:41 a.m., MEI exited the garage of the MEI Residence driving the Subject Vehicle. At roughly 10:15 a.m., the Porsche arrived in the parking lot of the meet location and parked next to the CSV. MEI exited the Porsche holding a green bag and got into the rear passenger side of the CSV. A short time later, MEI exited the CSV, re-entered the Porsche and drove away.

33.     CS-1 departed the area and reunited with law enforcement, who took possession of the green bag. Inside the green bag, law enforcement recovered $51,500 in bulk cash. Law enforcement performed a K9 sniff of the currency, which alerted positive for narcotic odor. During a subsequent debriefing, CS-1 told law enforcement that as CS-1 departed the area, MEI called CS-1 via WeChat and told CS-1 that MEI believed she was being followed by law enforcement; however, MEI did not correctly identify the law enforcement vehicle to CS-1. Law enforcement then deposited the bulk cash into a bank and used an HSI undercover cryptocurrency wallet to send $50,000 worth of USDT to the two cryptocurrency wallets that MEI had specified to CS-1.

### *July 15, 2024 Attempted Bulk Cash Pickup*

34.     Consistent with the prior transactions described in this affidavit and according to CS-1 and audio recordings, on or about July 14, 2024, MEI contacted CS-1 via WeChat and asked if CS-1 could accept two separate deliveries of approximately $40,000 each in bulk cash and exchange half of it for cryptocurrency and the other half for Chinese renminbi. MEI explained to CS-1 that she did not want to bring the

full $80,000 to CS-1 at once because she was nervous and wanted to be cautious. MEI and CS-1 agreed to meet the following morning.

35.     The following day, on or about July 15, 2024, at approximately 8:30 a.m., MEI contacted CS-1 via WeChat and asked CS-1 to meet her at approximately 10:00 a.m. to pick up the $40,000. MEI then sent CS-1, via WeChat, a cryptocurrency wallet code and information for a Chinese bank account to which to transfer the money.

36.     At approximately 8:45 a.m., law enforcement conducted surveillance outside the MEI Residence. At approximately 9:00 a.m., MEI contacted CS-1 via WeChat and asked to meet earlier. At approximately 9:15 a.m., law enforcement observed MEI's garage door open, and MEI drove out in the Subject Vehicle. CS-1 contacted MEI and MEI told CS-1 that she would meet with CS-1 shortly and have the bulk cash with her.

37.     At approximately 9:45 a.m., law enforcement conducted a traffic stop of MEI in the Porsche. A law enforcement K-9 performed a sniff of the interior of the Porsche and alerted positive to the odor of narcotics. Law enforcement then searched the Porsche and found bulk cash inside a white fanny pack and two cell phones. The law enforcement K-9 also performed a sniff of the bulk cash and once again alerted positive to the odor of narcotics. Law enforcement detained MEI, then took custody of the bulk cash and the two cell phones and transported MEI to a law enforcement office for an interview. MEI declined to make any statements to law enforcement.

### *October 18, 2024: Interview of Individual B*

38.    On October 18, 2024, HSI interviewed Individual B, who along with Individual C was identified delivering bulk cash to MEI on February 15, 2024. Individual B explained that s/he began working for an unknown Mexican male who Individual B referred to as "boss" who offered Individual B a job to earn extra money. "Boss" instructed Individual B to pick up bulk cash in the Chicago area and then deliver that bulk cash to another person in the Chicago area. Each time Individual B did a delivery, s/he earned approximately $750. Individual B explained s/he mainly picked up the bulk cash from Latin individuals and would deliver the bulk cash to individuals of Chinese or Middle Eastern descent. Individual B admitted to law enforcement that the bulk cash s/he delivered were the proceeds of narcotics.

39.    Based on the foregoing, I respectfully submit that there is probable cause to believe that MEI has committed money laundering and unlawful operation of unlicensed money transmitting business violations, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1960.

FURTHER AFFIANT SAYETH NOT.

*Robert J. Kelly, Jr.*
ROBERT J. KELLY, JR.
Special Agent,
Homeland Security Investigations

SWORN TO AND AFFIRMED by telephone July 31, 2025.

*Maria Valdez*
Honorable MARIA VALDEZ
United States Magistrate Judge

17